UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SWIRE PACIFIC OFFSHORE (DUBAI) LLC,                    :
                                                      :
                            Plaintiff,                :         07 Civ. 9449 (LAK)
                                                      :
            - against -                               :         ECF CASE
                                                      :
DOLPHIN OFFSHORE ENTERPRISES                          :
(INDIA) LIMITED,                                      :
                                                      :
                            Defendant.                :
------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT
## OF PRAYER FOR EX-PARTE ORDER OF
## MARITIME ATTACHMENT AND GARNISHMENT

Plaintiff, Swire Pacific Offshore (Dubai) LLC (hereinafter referred to as "SPO" or

"Plaintiff"), by its undersigned counsel, Lennon, Murphy & Lennon, LLC, respectfully submits

the within Memorandum of Law in Support of its application for an Ex-Parte Order of Maritime

Attachment against Defendant Dolphin Offshore Enterprises (hereinafter "Dolphin") pursuant to

Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure. ("Rule

B").

Plaintiff's counsel initially presented the proposed Ex-Parte Order of Attachment to this

Court for review and signature on October 23, 2007. However, the Court declined sign the

Order and requested further briefing. Plaintiff was requested to write a memorandum of law in

support of its application explaining: (1) why the Plaintiff is entitled to interest for five years; (2)

why the Order should issue considering that the underlying breach occurred approximately five

years ago; and (3) why the attachment should issue considering that arbitration had not been

initiated. Furthermore, the Court requested that Plaintiff show that Defendant had minimum

contacts with the U.S.

As will be shown herein, Plaintiff is entitled to the interest requested. There has been no undue delay, and regardless, this is a defense to be raised by Defendant at a later date. Finally, the arbitration has been initiated and Plaintiff need not show that Defendant has minimum contacts with the U.S. in the context of a quasi in rem maritime action in order to sustain jurisdiction. Therefore, all four issues have been addressed and overcome.

Plaintiff has met its burden to show that an Ex-Parte Order of Attachment and Garnishment should issue as established under Rule B and by the Second Circuit Court of Appeal's decision in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006). Thus, Plaintiff's application for an Ex-Parte Order should be granted.

<div align="center">

**POINT I**

**SPO HAS SATISFIED ITS BURDEN OF PROOF
UNDER SUPPLEMENTAL ADMIRALTY RULE B**

</div>

SPO has carried its burden to demonstrate that this Court should issue the requested Order of Attachment. Under Supplemental Rule B, an order of maritime attachment **must** issue upon a minimal prima facie showing provided that the defendant cannot be found within the district in which the assets are sought to be attached. Supplemental Rule B provides, in relevant part:

> If a defendant is not found within the district..., a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property – up to the amount sued for – in the hands of garnishees named in the process. The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district. The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

<div align="center">2</div>

Fed. R. Civ. P. Supp. Rule B(1). As recently summarized by the Court of Appeals for the

Second Circuit:

> To begin the process, a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. [Fed.R.Civ.P. Supp. Rule B(1).] If the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment, which the plaintiff may then serve on any persons in possession of the defendant's property located within the district. The order of attachment may be requested and granted ex parte, though notice of the attachment to the defendant via appropriate service is required. Id. Supp. Rules B(2), E(3).

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 438 (2d Cir. 2006). "The

power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction

given to the federal courts under Article III of the Constitution," and its "historical purpose has

been two-fold: first, to gain jurisdiction over an absent defendant; and second, to assure

satisfaction of a judgment." *Id. accord Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 268

(2d Cir. 2002).

The Second Circuit has emphasized that Rule B specifies the sum total of what must be

shown for a valid maritime attachment. *Aqua Stoli*, 460 F.3d. at 447. Moreover, the Second

Circuit held that upon the plaintiff's showing that the attachment was properly ordered, and that

it complied with the requirements of Rules B and E, the "defendant bears the burden of

"establish[ing] any equitable grounds for vacatur." *Id.* at 436.

Thus, once a plaintiff has established the technical requirements required by Rule B, the

burden then shifts to the defendant to establish one of the limited bases for vacatur. *Id.*

Here, Plaintiff has met its burden. Plaintiff has alleged a prima facie valid maritime

claim in its Verified Complaint, particularly a breach of a maritime contract. *See Verified

Complaint annexed hereto as Exhibit "A."* Defendant failed to pay hire due and owing to

3

Plaintiff thereunder. It is axiomatic that a failure to pay hire due and owing under a charter party is a maritime claim.

In addition, Plaintiff submitted an affidavit to the Court, attesting to the fact that Defendant was not present in the district and that Defendant's assets are or will soon be in the district. *See Affidavit in Support of Maritime Attachment annexed hereto as Exhibit "B."*

Here the Court's inquiry as to whether the attachment shall issue should end. Any defenses, including undue delay or the quantum of security requested, should be raised at the Rule E(4)(f) hearing and/or in the underlying arbitration.

As the Second Circuit has made clear, since Plaintiff alleged a prima facie valid maritime claim against Defendant and attested to the fact that Defendant is not in the district and Defendant's property is or will soon be in the district, an Ex-Parte Order of Attachment should issue against the Defendant pursuant to Supplemental Rule B.

<div align="center">

**POINT II**

**PLAINTIFF'S REQUEST FOR INTEREST COMPLIES WITH THE**
**TERMS OF THE CONTRACT AND IS A PROPER BASIS FOR SECURITY**
</div>

Plaintiff's request for interest, costs and attorneys' fees is proper because such fees are routinely awarded to the prevailing party in London arbitration pursuant to English law. *See e.g., Proton Shipping Inc. v. Sovarex, S.A.,* 05 Civ. 10295 (PAC), 2006 U.S. Dist. LEXIS 2389, *4 (January 23, 2006). Furthermore, "it is well-settled that in an attachment proceeding, the plaintiff need not prove its damages with exactitude." *Dongbu Express Co., Ltd. v. Navios Corp.,* 944 F. Supp. 235, (S.D.N.Y. 1996); *citing, e.g., Bergensen v. Lindholm,* 760 F. Supp. 976, 986 (D. Conn. 1991). The plaintiff need only satisfy the court that its claims are not frivolous. *See Royal Swan Navigation Co., Ltd. v. Global Container Lines, Ltd.,* 868 F. Supp. 599 (S.D.N.Y. 1994).

<div align="center">4</div>

As indicated in the Complaint, Defendant breached the charter party in 2002. Thus, pursuant to the interest clause in the contract, Plaintiff is entitled to interest from 2002, amounting to approximately $533,486.60. Furthermore as shown above, Plaintiff is entitled to security for its estimated interest to be incurred during the arbitration proceedings. This amounts to an additional $180,277.68.

The parties clearly contemplated that interest was to accrue on overdue amounts under the charter party contract as an interest provision was expressly included therein! Regardless, Defendant has been overtly trying to avoid paying the hire to Plaintiff for over five years. Thus, it would be highly inequitable for Defendant to escape paying interest now since it is the party who has made it so difficult to collect. [1] If Defendant wishes to raise an objection to the amount of interest requested, it may do so at the appropriate time.

Finally, there has been no delay in pursuing Plaintiff's claims. Defendant has been promising to pay over and over again, yet has failed to come through every time. It has been a cat and mouse game for five years. Plaintiff should not be punished and deprived of all interest on its claim because it thought Defendant was going to make good on its promises and pay the hire. Moreover, Plaintiff has no obligation to disprove all possible defenses to its claim when requesting the attachment. No such requirement can be found in the case law or the Supplemental Rules.

Plaintiff has at all times been diligently pursuing its claim against Defendant. At this point, Plaintiff has realized that Defendant never intends to pay, despite its constant promises, and it must seek security therefore.

---

[1]    Furthermore it should be noted that the statute of limitations in New York for breach of contract is six years. Thus, given that the statute conceives of bringing suit within six years, a request to interest for five would seem to be implicitly acceptable.

How the interest was to accrue was provided for in the charter party contract. The actual length of time in which interest has accrued is Defendant's burden to bear. Plaintiff would love to have been paid five years ago. However, Defendant has strung this matter out. Plaintiff should not be prejudiced by Defendant's dilatory practices.

As Plaintiff's application for security for attorney's fees and interest is a good faith estimate of the interest accrued under the contract and its future recoverable costs in the arbitration, we respectfully request that your Honor sign the Ex-Parte Order of Maritime Attachment and Garnishment allowing Plaintiff to search for Defendant's property in the amount requested.

<div align="center">

**POINT III**

**PLAINTIFF IS PERMITTED TO OBTAIN AN EX-PARTE ORDER OF MARTIME ATTACHMENT IN ANTICIPATION OF ARBITRATION, AND EITHER WAY THE POINT IS MOOT AS ARBITRATION HAS NOW BEEN COMMENCED**

</div>

First, we must note that Plaintiff has now initiated arbitration against Defendant on it claims, and thus this issue is moot. *See Letters commencing arbitration annexed hereto as Exhibit "C."*

However, even if the arbitration had not been initiated, the Ex-Parte Order of Attachment should still have been issued. Courts have routinely allowed a plaintiff to apply for an attachment in contemplation of litigation and/or arbitration. *See, e.g., AET Inc., Ltd. v. Procuradoria De Servicios Martimos Cardoso & Fonesca*, 464 F. Supp. 2d 241 (S.D.N.Y. 2006) (plaintiff filed a valid action to obtain security in contemplation of litigation in Brazil); *World Reach Shipping Ltd. v. Indus. Carriers Inc.*, No. 06 Civ. 3756 (NRB), 2006 U.S. Dist. LEXIS 83224, 2006 WL 3316828 (S.D.N.Y. Nov. 9, 2006) (plaintiff satisfied the standards for attachment in an action to obtain security pre-arbitration); *Ronda Ship Management v. Doha*

6

*Asian Games Organising, Committee*, 2007 U.S. Dist. LEXIS 72694 (S.D.N.Y. Sept. 20,

2007)(plaintiff who sought an attachment in contemplation of litigation in London did not act

prematurely).

For the foregoing reasons, Plaintiff's request for an Ex-Parte Order of Attachment is

proper and should be granted.

<div align="center">

**POINT IV**

**THE SECOND CIRCUIT EXPRESSLY REJECTED A
"MINIMUM CONTACTS TEST" IN RELATION TO MARITIME
ATTACHMENTS  IN *WINTER STORM SHIPPING, LTD. v. TPI***

</div>

Your Honor suggested that Plaintiff is required to show that the Defendant or the action

has minimum contacts with the district or the U.S. *in order to obtain the attachment.*   However,

as shown above, this requirement is not present in the Supplemental Rules or the case law

interpreting them.   The sum total of what is required to obtain an attachment is set forth in the

Rules.   If Defendant would like to make an objection at a later time in this regard, it is free to do

so when it appears.   However the inquiry at this stage should be limited to determining whether

the requirements expressly listed in Rule B have been met.   At best, it is premature at this time

to consider this issue.

Furthermore, although it is unnecessary to reach this argument to determine whether the

attachment should be issued, Plaintiff submits that the minimum contacts "test" does not apply in

this context at all.   The "minimum contacts" test/argument was expressly rejected by the Second

Circuit in *Winter Storm Shipping, Ltd. v. TPI.*   We gather that the Court was thinking of *Shaffer

v. Heitner*, 433 U.S. 186 (1977) and *Amoco Overseas Oil Co. v. Compagnie Nationale

Algerienne de Navigation*, 205 F.2d 648 (2d Cir. 1979) in making this assertion. However, these

cases do not apply in this context and Plaintiff need not make this showing.

Specifically, the exact argument raised by the Court was expressly rejected in a seven-page analysis by the U.S. Court of Appeals for the Second Circuit in *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263, 268-274 (2d Cir. 2002), under Section III entitled "Due Process." In *Winter Storm*, the Second Circuit reversed the district court that had vacated the attachment of an EFT on the basis of, *inter alia*, lack of due process.

The *Winter Storm* decision is precisely on point because it explains why due process is satisfied in the context of a maritime attachment of an EFT. *Winter Storm* also explains why *Shaffer v. Heitner*, 433 U.S. 186 (1977) and *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 205 F.2d 648 (2d Cir. 1979) are inapplicable to our situation. In *Winter Storm* the defendant argued that permitting EFTs to be attached at unforeseen and unknown intermediary banks runs contrary to the minimal due process accorded maritime defendants. The district court agreed and held that a maritime defendant must be reasonably able to foresee being sued in the United States based on the location of its property. On appeal, the defendant/appellee urged this due process theory in resisting the challenge by the plaintiff/appellant.

Most importantly, the Second Circuit reversed the district court and held, *inter alia*, that a maritime attachment of an EFT passed constitutional muster. The *Winter Storm* court held as follows:

> Given its procedural circumstances, <u>Amoco</u> cannot be regarded as a square holding, one way or the other, on the applicability of <u>Shaffer</u>-style due process requirements to maritime attachments. Such indications as may be gleaned from the opinion seem to point in the direction of subjecting admiralty attachments to less stringent requirements.
>
> \* \* \*
>
> Notwithstanding the unanimity of the post-<u>Shaffer</u> appellate decisions upholding the constitutionality of Admiralty Rule B, the drafters of the rules amended Rule

8

> B(1) in 1985 in order to address any possible due process concerns. While the
> practice of granting maritime attachments on an ex parte basis remains, Rule B(1)
> now requires the plaintiff to appear before a judge to procure an attachment. <u>See</u>
> Rule B(1)(b)("The court must review the complaint and affidavit and, if the
> conditions of this Rule B appear to exist, enter an order so stating and authorizing
> process of attachment and garnishment.").

*Winter Storm*, 310 F.3d at 271-272.

The Advisory Committee Notes to the 1985 amendments explained that Rule B(1) was

amended to provide for judicial scrutiny before the issuance of any attachment or garnishment

process. Its purpose was to eliminate doubts as to whether the Rule is consistent with the

principles of procedural due process enunciated by the Supreme Court. *Id.* at 272. The 1985

amendments to the Admiralty Rules also included an addition to Rule E, which contains general

provisions for practice in actions *in rem* and *quasi in rem*. New Rule E(4)(f) provides:

"Whenever property is arrested or attached, any person claiming an interest in it shall be entitled

to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment

should not be vacated or other relief granted consistent with these rules." The Advisory

Committee notes explain that "Rule E(4)(f) is designed to satisfy the constitutional requirement

of due process by guaranteeing a prompt post-seizure hearing at which he can attack the

complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings."

*Winter Storm*, 310 F.3d at 272.

The *Winter Storm* court noted that "It does not appear that any court subsequent to the

1985 amendments has questioned the constitutionality of maritime attachment under Rule B, let

alone holding the Rule and the admiralty practice under it constitutionally infirm on due process

grounds." *Id.* The Second Circuit went on to hold as follows:

> Due process concerns having been expressed in the case before us, they must be
> assessed in the light of the 1985 amendments to Admiralty Rules B and E. The
> district court did not refer to those amendments, and the cases the court cited

antedate them.    Under the rules as presently worded, process of maritime attachment cannot issue (absent exigent circumstances) unless a judge authorizes the process, and a defendant property owner is entitled to prompt notice of the attachment and a court hearing to test its validity. These amendments were fashioned for the stated purpose of addressing due process concerns. No court has subsequently suggested that the amendments were inadequate to that task.

The practical effect of the district court's analysis is that, in addition to the due process safeguards the 1985 amendments extended to defendants, funds in an EFT can never be subjected to maritime attachment unless the defendant also had specific advance knowledge of the name and address of the intermediary bank. We do not agree that so significant a restriction should be placed upon the traditional admiralty practice of maritime attachment. The use of EFTs, product of the modern electronic age, is widespread in international trade. Banking networks serving global commerce tend to use intermediary banks in the world's financial capitals such as New York, a wholly foreseeable arrangement that this Court noted in Reibor, 759 F.2d at 266…

* * *

We regard the due process safeguards added by the 1985 amendments to Admiralty Rules B and E as sufficient to satisfy constitutional requirements, and discern in the due process clause no basis for rendering the traditional remedy of maritime attachment inapplicable to electronic transfers of funds familiar to those engaged in international trade and increasingly used by them. Accordingly we hold that when an individual or company transfers funds by means of an EFT, those funds may be subjected to maritime attachment in the hands of an intermediary bank without violating constitutional due process, whether or not the initiator of the transfer knew which intermediary bank would be used to effect it.

*Winter Storm*, 310 F.3d at 273.

When the facts of the instant case are applied to the Second Circuit's *Winter Storm*

decision, it is clear that the due process argument must fail.  In this case, due process is satisfied

because the attachment orders will be duly issued pursuant to Admiralty Rule B(1) and because

Defendant has the right to a post-attachment hearing.  Accordingly, Plaintiff's application for an

Ex-Parte Order of Attachment should be granted.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Plaintiff's application for an Ex-Parte

Order of Maritime Attachment and Garnishment should be granted.   *Please find the proposed*

*Ex-Parte Order of Attachment and Order Appointing Special Process Server annexed hereto as*

*Exhibits "D" and "E."*

Dated: November 1, 2007
      Southport, CT

                       LENNON, MURPHY & LENNON, LLC
                       Attorneys for Plaintiff
                       SWIRE PACIFIC OFFSHORE (DUBAI) LLC

By:

                       Patrick F. Lennon
                       Nancy R. Peterson
                       The Gray Bar Building
                       420 Lexington Ave., Suite 300
                       New York, NY 10170
                       (212) 490-6050 - phone
                       (212) 490-6070 - facsimile
                       pfl@lenmur.com
                       nrp@lenmur.com

EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE KAPLAN

-----------------------------------------------------------------X

SWIRE PACIFIC OFFSHORE (DUBAI) LLC,

                 Plaintiff,

    - against -

DOLPHIN OFFSHORE ENTERPRISES
(INDIA) LIMITED.,

                 Defendant.

-----------------------------------------------------------------X

07 CIV 9449

07 Civ. _____

ECF CASE

RECEIVED
OCT 2 9 2007
U.S.D.C. S.D. N.Y.
CASHIERS

## VERIFIED COMPLAINT

Plaintiff, SWIRE PACIFIC OFFSHORE (DUBAI) LLC. ("Plaintiff" or "Swire"), by and through its attorneys, Lennon, Murphy & Lennon, LLC, as and for its Verified Complaint against the Defendant, DOLPHIN OFFSHORE ENTERPRISES (INDIA) LIMITED ("Defendant" of "Dolphin") alleges, upon information and belief, as follows:

    1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333. Jurisdiction over this matter is also present pursuant to the Federal Arbitration Act, 9 United States Code § 1 *et seq.*, and this Court's federal question jurisdiction, 28 United States Code § 1331.

    2.      At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity organized and existing under the laws of Dubai, United Arab Emirates.

    3.      Upon information and belief, Defendant was, and still is, a foreign corporation, or other business entity organized and existing under foreign law with an address in Mumbai, India.

    4.      At all material times, Plaintiff was the Owner of the anchor handling tug "PACIFIC RAPIER" (hereinafter the "Vessel").

5.    By an October 9, 2001 charter party on the Supplytime 89 form (see Exhibit "1" attached hereto), Plaintiff chartered the Vessel to Defendant at the rate of $3,900 per day for an initial period of 12 days.

6.    The parties also entered into a separate agreement for the purchase of the Vessel by Defendant that provided for a credit of $1,100 per day against the $3,900 daily hire if the sale of the Vessel was consummated, but ultimately the sale was not completed.

7.    During the course of the charter period, the October 9, 2001 charter was extended, with the Defendant ultimately redelivering the Vessel to Plaintiff on February 2, 2002.

8.    Also during the course of the charter period there was an agreed period of off hire, as well as two periods when Plaintiff agreed to charge Defendant at a lower daily rate of hire than the $3,900 per day rate specified in the October 9, 2001 charter party contract.

9.    At the conclusion of the charter when the Defendant redelivered the Vessel to Plaintiff on February 2, 2002, and taking into account the off hire period and periods when Plaintiff charged Defendant at a reduced daily rate, as referred to in Paragraph 8, above, Defendant owed Plaintiff the sum of $300,462.86 in outstanding hire.

10.    The October 9, 2001 charter party contract provided at Part I, Clause 21(i) and Clause 23 that hire was to be paid 30 days in arrears, and at Part I, Clause 24 and Part II, Clause 10(e) provided that interest would accrue on unpaid hire at the rate of 2.5% every 30 days.

11.    As of October 23, 2007, interest on the principal amount of outstanding hire in the sum of $300,462.86, at the rate specified in the charter party contract as described in Paragraph 10, above, accrued to the sum of $533,486.60.

12.    On various occasions, Defendant has admitted its outstanding indebtedness to Plaintiff on the principal sum of $300,462.86, but failed and/or refused to pay the amount due.

13.    Pursuant to Part I, Clause 33 and Part II, Clause 31(a) of the charter party, all disputes arising thereunder are to be submitted to arbitration in London.

14.    Despite due demand, Defendant has failed to pay the sums due and owing to Plaintiff.

15.    Plaintiff is preparing to commence arbitration proceedings against Defendant on its claims.

16.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs, including attorney's fees, arbitrator's fees, disbursements and interest are recoverable as an element of the Plaintiff's claim.

17.    As best as can now be estimated, Plaintiff expects to recover the following amounts in the Final Arbitration Award(s):

| | | | |
|---|---|---|---|
| A. | Principal claim: | | $300,462.86 |
| B. | Interest on claims: | | |
| | i. | to October 23, 2007 | $533,486.60 |
| | ii. | additional period until completion of arbitration 2 years: | $180,277.68 |
| C. | Estimated attorneys' fees and expenses: | | $60,000.00 |
| D. | Estimated arbitration costs: | | $15,000.00 |
| **Total** | | | **$1,089.227.14** |

18.    The Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendant has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of one or more garnishees which are believed to be due and owing to the Defendant.

19.    The Plaintiff seeks an order from this court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, and also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching, *inter alia*, any assets of the Defendant held by the aforesaid garnishee for the purpose of obtaining personal jurisdiction over the Defendant, and to secure the Plaintiff's claims as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B.    That the Court retain jurisdiction to compel the Defendant to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

C.    That since the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, also pursuant to the United States Arbitration Act, 9 U.S.C. §§ 1 and 8, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee within the District which are due and owing to the Defendant, in the amount **$1,089.227.14** calculated to date to secure the Plaintiff's claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

4

D.      That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court

E.      That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof;

F.      That this Court award Plaintiff its attorney's fees and costs of this action; and

G.      That the Plaintiff have such other, further and different relief as the Court

may deem just and proper.

Dated: October 23, 2007
       Southport, CT

                        The Plaintiff,
                        SWIRE PACIFIC OFFSHORE (DUBAI) LLC


                        By: _____
                            Patrick F. Lennon (2162)
                            Nancy R. Peterson (NP 2871)
                            LENNON, MURPHY & LENNON, LLC
                            The GrayBar Building
                            420 Lexington Ave., Suite 300
                            New York, NY 10170
                            (212) 490-6050 – phone
                            (212) 490-6070 – fax
                            pfl@lenmur.com
                            nrp@lenmur.com

5

## ATTORNEY'S VERIFICATION

State of Connecticut )
                )    ss.:    Southport
County of Fairfield )

1.      My name is Nancy R. Peterson

2.      I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.      I am an attorney in the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Plaintiff.

4.      I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.      The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:      October 23, 2007
             Southport, CT

                                           Nancy R. Peterson

6

EXHIBIT "1"

| 1. Place and Date:<br><br>Dubai, 9 October 2001 | UNIFORM TIME CHARTER PARTY<br>FOR OFFSHORE SERVICE VESSELS<br>CODE NAME: "SUPPLYTIME 89"<br><div align="right">PART I</div> | |
|---|---|---|
| 2. Owners / Place of Business (full style, address and telex/telefax No) (Cl.1(a))<br>Swire Pacific Offshore (Dubai) LLC<br>Dubai Drydocks Industrial Estate<br>P O Box 8127, Dubai<br>United Arab Emirates | 3. Charterer / Place of Business (full style, address, telex/telefax No) (Cl.1(a))<br>Dolphin Offshore Enterprises (I) Limited<br>1001 Raheja Centre<br>214 Nariman Point<br>Mumbai 400 021<br>India | |
| 4. Vessel's Name (Cl.1(a))<br><br>M.V. Pacific Rapier | 5. Date of Delivery (Cl.2(a))<br><br>14 October 2001 | 6. Cancelling Date (Cl.2(a) and (c))<br>18 October 2001 |
| 7. Port or Place of Delivery (Cl.2(a))<br><br>Jebel Ali, United Arab Emirates. | 8. Port or Place of Redelivery / Notice of Redelivery (Cl.2(d)) | |
| | (i) Port or Place of Redelivery<br>Jebel Ali or Sharjah, United Arab Emirates. | |
| | (ii) Number of Day's Notice of Redelivery<br>3 Days | |
| 9. Period of Hire (Cl.1(a))<br><br>Firm 12 days. | 10. Extension of Period of Hire (Optional) (Cl.1(b)) | |
| | (i) Period of Extension<br><br>18 days | |
| | (ii) Advance Notice for Declaration of Option (Days)<br>2 days | |
| 11. Automatic Extension Period to Complete Voyage or Well (Cl.1(c)) | 12. Mobilization Charge (Lump Sum and When Due) | |
| (i) Voyage or Well (State Which)<br>Voyage | (i)      Lump Sum (US$)<br>Nil | |
| (ii) Maximum Extension Period (State Number of Days)<br><br>Five day | (ii) When Due | |
| | 13. Port or Place of Mobilization (Cl. 2(b)(i)) | |
| 14. Early Termination of Charter (State Amount of Hire Payable) (Cl.26(a))<br><br>Not Applicable | 15. Number of Days' Notice of Early Termination (Cl.26(a)) | 16. Demobilization Charge (Lump Sum) (Cl.2(e) and Cl.26(a))<br><br>Nil |
| 17. Area of Operation (Cl.5(a))<br><br>Voyages between UAE and India. | 18. Employment of Vessel Restricted to (State Nature of Service(s) (Cl.5(a))<br>Carriage of cargo and Diving Equipment. | |

Continued                              SUPPLY TIME 89 Uniform Time Charter Party

| 19. Charter Hire (State Rate & Currency) (Cl. 10(a) and (d)) | 20. Extension Hire (If Agreed, State Rate) (Cl. 10(b)) |
|---|---|
| USD 3,900.00 (Three Thousand Nine Hundred American Dollars) per day or pro-rata excluding fuel, lubes, water, all taxes. | Same as in box 19 |

| 21. Invoicing for Hire & Other Payments (Cl.10(d)) | 22. Payment (State Mode and Place of Payment: Also State Beneficiary and Bank Account) (Cl.10(e)) |
|---|---|
| (i) State whether to be issued in advance or arrears  Arrears | By telegraphic transfer in USD to :- |
| (ii) State to whom to be issued if addressee Other Than Box 2: | To the Owners account as shown upon the invoice. |
| (ii) State to whom to be issued if addressee Other Than Box 3: | All bank charges to be for Charterers account. |

| 23. Payment of Hire, Bunker Invoices and Disbursements for Charterer's Account (State Maximum Number of Days) {Cl.10(e)}  Within 30 calendar days | 24. Interest Rate Payable (Cl.10(e)) 2.5% per 30 days or pro-rata | 25. Maximum Audit Period (Cl.10(f)) 2 years |
|---|---|---|

| 26. Meals (State Rate Agreed) (Cl.5(c)(i))  USD10.00 / man / meal | 27. Accommodation (Rate Agreed) (Cl.5(c)(i))  USD10.00 / man / bunk / night | 28. Mutual Waiver of Recourse (Optional, State Whether Applicable) (Cl.12(f))  Applicable, cargo carried at shippers risk. |
|---|---|---|

| 29. Sublet (State Amount of Daily Increment to Charter Hire) (Cl.17(b))  Nil | 30. War (State Name of Countries) (Cl.19(e))  U.A.E. India & Panama. |
|---|---|

| 31. General Average (Place of Settlement - Only to be filled in if other than London) (Cl.21) | 32. Breakdown (State Period) (Cl.26(b)(v))  5 calendar days |
|---|---|

| 33. Law and Arbitration (State Cl.31(a) or 31(b) or 31(c) As Agreed; if Cl.31(c) agreed also state place of arbitration) (Cl.31)  31(a) | 34. Numbers of Additional Clauses Covering Special Provisions If Agreed |
|---|---|

| 35. Name and Address for Notices and Other Communications Required to be Given by the Owners (Cl.28)  See Box 3  Attn Vikram Pahlajani, Vice President  Tel 91 22 287 5414 / 283 2226  Fax 91 22 287 5403  Email vikram_dolphin@pacific.net.in | 36. Name and Address for Notices and Other Communications Required to be Given by the Charterer (Cl.28)  See Box 2  Attn Paul Bundy, General Manager  Tel 971 4 345 7515  Fax 971 4 345 7241  Email info@swire.co.ae |
|---|---|

It is mutually agreed that this Contract shall be performed subject to the conditions contained in the Charter consisting of PART I, including additional clauses if any agreed and stated in Box 34, and PART II as well as ANNEX "A" and ANNEX "B" as annexed to this Charter. In the event of a conflict of conditions, the provisions of PART I shall prevail over those of PART II and ANNEX "A" and ANNEX "B" to the extent of such conflict but not further. ANNEX "C" as annexed to this Charter is optional and shall only apply if expressly agreed and stated in Box 28.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| Swire Pacific Offshore (Dubai) LLC | Dolphin Offshore Enterprises (I) Limited |



PART II

"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

1   Period

(a) The Owners stated in Box 2 let and the Charterers stated in Box 3 hire the Vessel named in Box 4, as specified in ANNEX "A" (hereinafter referred to as "the vessel"), for the period as stated in Box 9 from the time the Vessel is delivered to the Charterers.

(b) Subject to Clause 10(b), the Charterers have the option to extend the Charter Period in direct continuation for the period stated in Box 10(i), but such an option must be declared in accordance with Box 10(ii).

(c) The Charter Period shall automatically be extended for the time required to complete the voyage or well (whichever is stated in Box 11(i)) in progress, such time not to exceed the period stated in Box 11(ii).

2.   Delivery and Redelivery

(a) Delivery – Subject to sub-clause (b) of this Clause the Vessel shall be delivered by the Owners free of cargo and with clean tanks at any time between the date stated in Box 5 and the date stated in Box 6 at the port or place stated in Box 7 where the Vessel can safely lie always afloat.

(b) Mobilisation – (i) the Charterers shall pay a lump sum as stated in Box 12 without discount by way of mobilisation charge in consideration of the Owners giving delivery at the port or place stated in Box 7. The mobilisation charge shall not be affected by any change in the port or place of mobilisation from that stated in Box 13.

(ii) Should the Owners agree to the Vessel loading and transporting cargo and/or undertaking any other service for the Charterers en route to the port of delivery or from the port of redelivery, then all terms and conditions of this Charter Party shall apply to such loading and transporting and/or other service exactly as if performed during the Charter Period excepting only that any lump sum freight agreed in respect thereof shall be payable on shipment or commencement of the service as the case may be, the Vessel and/or goods lost or not lost.

(c) Cancelling – If the Vessel is not delivered by midnight local time on the cancelling date stated in Box 6, the Charterers shall be entitled to cancel this Charter Party. However, if despite the exercise of due diligence by the Owners, the Owners will be unable to deliver the Vessel by the cancelling date, they may give notice in writing to the Charterers at any time prior to the delivery date as stated in Box 5, and shall state in such notice the date by which they will be able to deliver the Vessel. The Charterers may within 24 hours of receipt of such notice give notice in writing to the Owners cancelling this Charter Party. If the Charterers do not give such notice, then the later date specified in the Owners' notice shall be substituted for the cancelling date for all the purposes of this Charter Party. In the event the Charterers cancel the Charter Party, it shall terminate on terms that neither party shall be liable to the other for any losses incurred by reason of the non-delivery of the Vessel or the cancellation of the Charter Party.

(d) Redelivery – The Vessel shall be redelivered on the expiration or earlier termination of this Charter Party free of cargo and with clean tanks at the port or place as stated in Box 8(i) or such other port or place as may be mutually agreed. The Charterers shall give not less than the number of days notice in writing of their intention to redeliver the Vessel, as stated in Box 8(ii).

(e) Demobilisation – The Charterers shall pay a lump sum without discount in the amount as stated in Box 16 by way of demobilisation charge which amount shall be paid on the expiration or on earlier termination of this Charter Party.

3.   Condition of Vessel

(a) The Owners undertake that at the date of delivery under this Charter Party the Vessel shall be of the description and classification as specified in ANNEX "A", attached hereto, and undertake to so maintain the Vessel during the period of service under this Charter Party.

(b) The Owners shall before and at the date of delivery of the Vessel and throughout the Charter Period exercise due diligence to make and maintain the Vessel tight, staunch, strong in good order and condition and, without prejudice to the generality of the foregoing, in very way fit to operate effectively at all times for the services as stated in Clause 5.

4.   Survey

The Owners and the Charterers shall jointly appoint an independent surveyor for the purpose of determining and agreeing in writing the condition of the Vessel, any anchor handling and towing equipment specified in Section 5 of ANNEX "A", and the quality and quantity of fuel, lubricants and water at the time of delivery and redelivery hereunder. The Owners and the Charterers shall jointly share the time and expense of such surveys.

5.   Employment and Area of Operation

(a) The Vessel shall be employed in offshore activities which are lawful in accordance with the law of the place of the Vessel's flag and/or registration and of the place of operation. Such activities shall be restricted to the service(s) as stated in Box 18, and to voyages between any good and safe port or place and any place or offshore unit where the Vessel can safely lie always afloat within the Area of Operation as stated in Box 17 which shall always be within institute Warranty Limits and which shall in no circumstance be exceeded without prior agreement and adjustment of the Hire and in accordance with such other terms as appropriate to be agreed; provided always that the Charterers do not warrant the safety of any such port or place or offshore unit but shall exercise due diligence in issuing their orders to the Vessel as if the Vessel were their own property and having regard to her capabilities and the nature of her employment. Unless otherwise agreed, the Vessel shall bot be employed as a diving platform.

(b) Relevant permission and licences from responsible authorities for the Vessel to enter, work in and leave the Area of Operation shall be obtained by the Charterers and the Owners shall assist, if necessary, in every way possible to secure such permission and licences.

(c) The Vessel's Space – The whole reach and burden and decks of the Vessel shall throughout the Charter Period be at the Charterers' disposal reserving proper and



PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

sufficient space for the Vessel's Master, Officers, Crew, tackle, apparel, furniture, provisions and stores. The Charterers shall be entitled to carry, so far as space is available and for their purposes in connection with their operations:

(i) Persons other than crew members, other than fare paying, and for such purposes to make use of the Vessel's available accommodation not being used on the voyage by the Vessel's crew. The Owners shall provide suitable provisions and requisites for such persons for which the Charterers shall pay at the rate as stated in Box 26 per meal and at the rate as stated in Box 27 per day for the provision of bedding and services for persons using berth accommodation.

(ii) Lawful cargo whether carried on or under deck.

(iii) Explosives and dangerous cargo, whether in bulk or packaged, provided proper notification has been given and such cargo is marked and packed in accordance with the national regulations of the Vessel and/or the International Maritime Dangerous Goods Code and/or other pertinent regulations. Failing such proper notification, marking or packing the Charterers shall indemnify the Owners in respect of any loss, damage or liability whatsoever and howsoever arising therefrom. The Charterers accept responsibility for any additional expenses (including reinstatement expenses) incurred by the Owners in relation to the carriage of explosives and dangerous cargo.

(iv) Hazardous and noxious substances, subject to Clause 12(g), proper notification and any pertinent regulations.

(d) Laying-up of Vessel – The Charterers shall have the option of laying up the Vessel at an agreed safe port or place for all or any portion of the Charter Period in which case the Hire hereunder shall continue to be paid but, if the period of such lay-up exceeds 30 consecutive days there shall be credited against such Hire the amount which the Owners shall reasonably have saved by way of reduction in expenses and overheads as a result of the lay-up of the Vessel.

6.  Master and Crew

(a)(i) The Master shall carry out his duties promptly and the Vessel shall render all reasonable services within her capabilities by day and by night and at such times and on such schedules as the Charterers may reasonably require without any obligations of the Charterers to pay to the Owners or the Master, Officers or the Crew of the Vessel any excess or overtime payments. The Charterers shall furnish the Master with all instructions and sailing directions and the Master and Engineer shall keep full and correct logs accessible to the Charterers or their agents.

(ii) The Master shall sign cargo documents as and in the form presented, the same, however, not to be Bills of Lading, but receipts which shall be non-negotiable documents and shall be marked as such. The Charterers shall indemnify the Owners against all consequences and liabilities arising from the Master, Officers against all consequences and liabilities arising from the Master, Officers or agents signing, under the direction of the Charterers, those cargo documents or other documents inconsistent with this Charter Party or from any irregularity in the papers supplied by the Charterers or their agents.

(b)        The Vessel's Crew if required by Charterers will connect and disconnect electric cables, fuel, water and pneumatic hoses when placed on board the Vessel in port as well as alongside the

offshore units; will operate the machinery on board the Vessel for loading and unloading cargoes; and will hook and unhook cargo on board the Vessel when loading or discharging alongside offshore units. If the port regulations or the seamen and/or labour unions do not permit the Crew of the Vessel to carry out any of this work, then the Charterers shall make, at their own expense, whatever other arrangements may be necessary, always under the direction of the Master.

(c)  If the Charterers have reason to be dissatisfied with the conduct of the Master or any Officer or member of the Crew, the Owners on receiving particulars of the complaint shall promptly investigate the matter and if the complaint proves to be well founded, the Owners shall as soon as reasonably possible make appropriate changes in the appointment.

(d) The entire operation, navigation, and management of the Vessel shall be in the exclusive control and command of the Owners, their Master, Officers and Crew. The Vessel will be operated and the services hereunder will be rendered as requested by the Charterers, subject always to the exclusive right of the Owners or the Master of the Vessel to determine whether operation of the Vessel may be safely undertaken. In the performance of the Charterer Party, the Owners are deemed to be an independent contractor, the Charterers being concerned only with the results of the services performed.

7.  Owners to Provide

(a)  The Owners shall provide and pay for all provisions, wages and all other expenses of the Master, Officers and Crew; all maintenance and repair of the Vessel's hull, machinery and equipment as specified in ANNEX "A"; also, except as otherwise provided in this Charter Party, for all insurance on the Vessel, all dues and charges directly related to the Vessel's flag and/or registration, all deck, cabin and engineroom stores, cordage required for ordinary ship's purposes mooring alongside in harbour, and all fumigation expenses and de-ratisation certificates. The Owners' obligations under this Clause extend to cover all liabilities for consular charges appertaining to the Master, Officers and Crew, customs or import duties arising at any time during the performance of this Charter Party in relation to the personal effects of the Master, Officers and Crew, and in relation to the stores, provisions and other matters as aforesaid which the Owners are to provide and/or pay for and the Owners shall refund to the Charterers any sums they or their agents may have paid or been compelled to pay in respect of such liability.

(b) On delivery the Vessel shall be equipped, if appropriate, at the Owners' expense wit any towing and anchor handling equipment specified in Section 5(b) of ANNEX "A". If during the Charter Period any such equipment becomes lost, damaged or unserviceable, other than as a result of the Owners' negligence, the Charterers shall either provide, or direct the Owners to provide, an equivalent replacement at the Charterers' expense.



p.t.o.

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

8.  Charterers to Provide

(a) While the Vessel is on hire the Charterers shall provide and pay for all fuel, lubricants, water, dispersants, firefighting foam and transport thereof, port charges, pilotage and boatmen and canal steersmen (whether compulsory or not), launch hire (unless incurred in connection with the Owners' business), light dues, tug assistance, canal, dock, harbour, tonnage and other dues and charges, agencies and commissions incurred on the Charterers' business, costs for security or other watchmen, and of quarantine (if occasioned by the nature of the cargo carried or the ports visited whilst employed under this Charter Party but not otherwise).
(b) At all times the Charterers shall provide and pay for the loading and unloading of cargoes so far as not done by the Vessel's crew, cleaning of cargo tanks, all necessary dunnage, uprights and shoring equipment for securing deck cargo, all cordage except as to be provided by the Owners, all ropes, slings and special runners (including bulk cargo discharge hoses) actually used for loading and discharging, inert gas required for the protection of cargo, and electrodes used for offshore works, and shall reimburse the Owners for the actual cost of replacement of special mooring lines to offshore units, wires, nylon spring lines etc. used for offshore works, all hose connections and adaptors, and further, shall refill oxygen / acetylene bottles used for offshore works.
(c) The Charterers shall pay for customs duties, all permits, import duties (including costs involved in establishing temporary or permanent importation bonds), and clearance expenses, both for the Vessel and/or equipment, required for or arising out of this Charter Party.

9.  Bunkers

Unless otherwise agreed, the Vessel shall be delivered with bunkers and lubricants as on board and redelivered with sufficient bunkers to reach the next bunkering stage on route to her next port of call. The Charterers upon delivery and the Owners upon redelivery shall take over and pay for the bunkers and lubricants on board at the prices prevailing at the times and ports of delivery and redelivery.

10.  Hire and Payments

(a) Hire - The Charterers shall pay Hire for the Vessel at the rate stated in Box 19 per day or pro rata for part thereof from the time that the Vessel is delivered tot he Charterers until the expiration or earlier termination of this Charter Party.
(b) Extension Hire - if the option to extend the Charter Period under Clause 1(b) is exercised. Hire for such extension shall, unless stated in Box 20, be mutually agreed between the Owners and the Charterers.
(c) Adjustment of Hire - The rate of hire shall be adjusted to reflect documented changes, after the date of entering into the Charter Party or the date of commencement of employment, whichever is earlier, in the Owners' costs arising from changes in the Charterers' requirements or regulations governing the Vessel and/or its Crew or this Charter Party.
(d) Invoicing - All invoices shall be issued in the contract currency stated in Box 19. In respect of reimbursable expenses incurred in currencies other than the contract currency, the rate of exchange into

the contract currency shall be that quoted by the Central Bank of the country of such other currency as at the date of the Owners' invoice. Invoices covering Hire and any other payments due shall be issued monthly as stated in Box 21(i) or at the expiration or earlier termination of this Charter Party. Notwithstanding the foregoing, bunkers and lubricants on board at delivery shall be invoiced at the time of delivery.
(e) Payments - Payments of Hire, bunker invoices and disbursements for the Charterers' account shall be received within the number of days stated in Box 23 from the date of receipt of the invoice. Payment shall be made in the contract currency in full without discount to the account stated in Box 22. However any advances for disbursements made on behalf of and approved by the Owners may be deducted from Hire due.
If payment is not received by the Owners within 5 banking days following the due date the Owners are entitled to charge interest at the rate stated in Box 24 on the amount outstanding from and including the due date until payment is received.
Where an invoice is disputed, the Charterers shall in any event pay the undisputed portion of the invoice but shall be entitled to withhold payment of the disputed portion provided that such portion is reasonably disputed and the Charterers specify such reason. Interest will be chargeable at the rate stated in Box 24 on such disputed amounts where resolved in favour of the Owners. Should the Owners prove the validity of the disputed portion of the invoice, balance payment shall be received by the Owners within 5 banking days after the dispute is resolved. Should the Charterers' claim be valid, a corrected invoice shall be issued by the Owners.
In default of payment as herein specified, the Owners may require the Charterers to make payment of the amount due within 5 banking days of receipt of notification from the Owners; failing which the Owners shall have the right to withdraw the Vessel without prejudice to any claim the Owners may have against the Charterers under this Charter Party.
While payment remains due the Owners shall be entitled to suspend the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and Hire shall continue to accrue and any extra expenses resulting from such suspension shall be for the Charterers' account.
(f) Audit - The Charterers shall have the right to appoint an independent chartered accountant to audit the Owners' books directly related to work performed under this Charter Party at any time after the conclusion of the Charter Party, up to the expiry of the period stated in Box 25, to determine the validity of the Owners' charges hereunder. The Owners undertake to make their records available for such purposes at their principal place of business during normal working hours. Any discrepancies discovered in payments made shall be promptly resolved by invoice or credit as appropriate.

11.  Suspension of Hire

p.t.o.

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

(a) If as a result of any deficiency of Crew or of the Owners' stores, strike of Master, Officers and Crew, breakdown of machinery, damage to hull or other accidents to the Vessel, the Vessel is prevented from working, no Hire shall be payable in respect of any time lost and any Hire paid in advance shall be adjusted accordingly provided always however that Hire shall not cease in the event of the Vessel being prevented from working as aforesaid as a result of:
(i)   the carriage of cargo as noted in Clause 5e (iii) and (iv);
(ii) quarantine or risk of quarantine unless caused by the Master, Officers or Crew having communication with the shore at any infected area not in connection with the employment of the Vessel without the consent or the instructions of the Charterers;
(iii)   detention from her Charter Party duties or exposure to abnormal risks at the request of the Charterers;
(iv)  detention in consequence of being driven into port or to anchorage through stress of weather or trading to shallow harbours or to river or ports with bars or suffering an accident to her cargo, when the expenses resulting from such detention shall be for the Charterers' account howsoever incurred;
(v) detention or damage by ice;
(vi) any act or omission of the Charterers, their servants or agents.
(b) Liability for Vessel not Working - The Owners' liability for any loss, damage or delay sustained by the Charterers as a result of the Vessel being prevented from working by any cause whatsoever shall be limited to suspension of hire.
(c) Maintenance and Drydocking - Notwithstanding sub-clause (a) hereof, the Charterers shall grant the Owners a maximum of 24 hours on hire, which shall be cumulative, per month or pro rata for part of a month from the commencement of the Charter Period for maintenance and repairs including drydocking (hereinafter referred to as "maintenance allowance"). The Vessel shall be drydocked at regular intervals. The Charterers shall place the Owners' disposal clean of cargo, at a port (to be nominated by the Owners at a later date) having facilities suitable to he Owners for the purpose of such drydocking.
During reasonable voyage time taken in transits between such port and Area of Operation the Vessel shall be on hire and such time shall not be counted against the accumulated maintenance allowance.
Hire shall be suspended during any time taken in maintenance repairs and drydocking in excess of the accumulated maintenance allowance.
In the event of less time being taken by the Owners for repairs and drydocking or, alternatively, the Charterers not making the Vessel available for all or part of this time, the Charterers shall, upon expiration or earlier termination of the Charter Party, pay the equivalent of the daily rate of Hire then prevailing in addition to Hire otherwise due under this Charter Party 1 respect of all such time not so taken or made available.
Upon commencement of the Charter Period, the Owners agree to furnish the Charterers with the Owners' proposed drydocking schedule and the Charterers agree to make every reasonable effort to assist the Owners in adhering to such predetermined drydocking schedule for the Vessel.

12.  Liabilities and Indemnities

(a) Owners - Notwithstanding anything else contained in this Charter Party excepting Clauses 5(c)(iii), 7(b), 8(b), 12(g), 15(c) and 21, the Charterers shall not be responsible for loss of or damage to the property of the Owners or of their contractors and sub-contractors, including the employees of the Owners or of their contractors and sub-contractors, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, injury or death is caused wholly or partially by the act, neglect or default of the Charterers, their employees, contractors or sub-contractors, and even if such loss, damage injury or death is caused wholly or partially by unseaworthiness of any vessel; and the Owners shall indemnify, protect, defend and hold harmless the Charterers from any and against all claims, costs, expenses, actions, proceedings, suits, demands and liabilities whatsoever arising out of or in connection with such loss, damage, personal injury or death.
(b) Charterers - Notwithstanding anything else contained in this Charter Party excepting Clause 21, the Owners shall not be responsible for loss of, damage to, or any liability arising out of anything towed by the Vessel, any cargo laden upon or carried by the Vessel or her tow, the property of the Charterers or of their contractors and sub-contractors, including their offshore units, or for personal injury or death of the employees of the Charterers or of their contractors and sub-contractors (other than the Owners and their contractors and sub-contractors) or of anyone on board anything towed by the Vessel, arising out of or in any way connected with the performance of this Charter Party, even if such loss, damage, liability, injury or death is caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors, and even if such loss, damage, liability, injury or death is caused wholly or partially by the unseaworthiness of any vessel; and the Charterers shall indemnify, protect, defend and hold harmless the Owners from any and against all claims, costs, expenses, actions, proceedings, suits, demands, and liabilities whatsoever arising out of or in connection with such loss, damage, liability, personal injury or death.
(c)  Consequential Damages  -  Neither party shall be liable to the other for, and each party hereby agrees to protect, defend and indemnify the other against, any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Charter Party, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.
(d)  Limitations  -  Nothing contained in this Charter Party shall be construed or held to deprive the Owners or the Charterers, as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Charter Party shall create any right to limit liability. Where the Owners or the Charterers may seek an indemnity under the provisions of this Charter Party or against each other in respect of



PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

a claim brought by a third party, the Party or against each other in respect of a claim brought by a third party, the Owners or the Charterers shall seek to limit their liability against such third party.

(e) Himalaya Clause - (i) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Charterers shall also apply to and be for the benefit of the Charterers' parent, affiliated, related and subsidiary companies; the Charterers' contractors, sun-contractors, clients, joint venturers and joint interest owners (always with respect to the job or project on which the Vessel is employed); their respective employees and their respective underwriters .

(ii) All exceptions, exemptions, defences, immunities, limitations of liability, indemnities, privileges and conditions granted or provided by this Charter Party or by any applicable statute, rule or regulation for the benefit of the Owners shall also apply to and be for the benefit of the Owners' parent, affiliated, related and subsidiary companies, the Owners' sub-contractors, the Vessel, its Master, Officer and Crew, its registered owner, its operator, its demise charterer(s), their respective employees and their respective underwriters.

(iii) The Owners or the Charterers shall be deemed to be acting as agent or trustee of and for the benefit of all such persons and parties set forth above, but only for the limited purpose of contracting for the extension of such benefits to such persons and parties.

(f) Mutual Waiver of Recourse (Optional only applicable if stated in Box 28, but regardless of whether this option is exercised the other provisions of Clause 12 shall apply and shall be paramount)
In order to avoid disputes regarding liability for personal injury or death of employees or for loss of or damage to property, the Owners and the Charterers have entered into, or by this Charter Party agree to enter into, an Agreement for Mutual Indemnity and Waiver of Recourse (in a form substantially similar to that specified in ANNEX "C") between the Owners, the Charterers and the various contractors and sub-contractors of the Charterers.

(g) Hazardous and Noxious Substances - Notwithstanding any other provision of this Charter Party to the contrary, the Charterers shall always be responsible for any losses, damages or liabilities suffered by the Owners, their employees, contractors or sub-contractors, by the Charterers or by third parties, with respect to the Vessel or other property, personal injury or death, pollution or otherwise, which losses, damages or liabilities are caused, directly or indirectly, as a result of the Vessel's carriage of any hazardous and noxious substances in whatever form as ordered by the Charterers, and the Charterers shall defend, indemnify the Owners and hold the Owners harmless for any expense, loss of liability whatsoever or howsoever arising with respect to the carriage of hazardous or noxious substances.

13. Pollution

(a) Except as otherwise provided for in Clause 15(c) (iii), the Owners shall be liable for, and agree to indemnify, defend and hold harmless the Charterers against, all claims, costs, expenses, actions, proceedings, suits, demands and liabilities

whatsoever arising out of actual or potential pollution damage and the cost of cleanup or control thereof arising from acts or omissions of the Owners or their personnel which cause or allow discharge, spills or leaks from the Vessel, except as may emanate from cargo thereon or therein.

(b) The Charterers shall be liable for and agree to indemnify, defend and hold harmless the Owners from all claims, costs, expenses, actions, proceedings, suits, demands, liabilities, loss or damage whatsoever arising out of or resulting from any other actual or potential pollution damage, even where caused wholly or partially by the act, neglect or default of the Owners, their employees, contractors or sub-contractors or by the unseaworthiness of the Vessel.

14. Insurance

(a) (i) The Owners shall procure and maintain in effect for the duration of this Carter Party, with reputable insurers, the insurances set forth in ANNEX "B" policy limits shall not be less than those indicated. Reasonable deductibles are acceptable and shall be for the account of the Owners.

(ii) The Charterers shall upon request be named as co-insured. The Owners shall upon request cause insurers to waive subrogation rights against the Charterers (as encompassed in Clause 12(a) (i). Co-insurance and/or waivers of subrogation shall be given only insofar as these relate to liabilities which are properly the responsibility of the Owners under the terms of this Charter Party.

(b) The Owners shall upon request furnish the Charterers with certificates of insurance which provide sufficient information to verify that the Owners have complied with the insurance requirements of this Charter Party.

(c) If the Owners fail to comply with the aforesaid insurance requirements, the Charterers may, without prejudice to any other rights or remedies under this Charter Party, purchase similar coverage and deduct the cost thereof from any payment due to the Owners under this Charter Party.

15. Saving of Life and Salvage

(a) The Vessel shall be permitted to deviate for the purpose of saving life at sea without prior approval of or notice to the Charterers and without loss of Hire provided however that notice of such deviation is given as soon as possible.

(b) Subject to the Charterers' consent, which shall not be unreasonably withheld, the Vessel shall be at liberty to undertake attempts at salvage, it being understood that the Vessel shall be off hire from the time she leaves port or commences to deviate and she shall remain off-hire until she is again in every way ready to resume the Charterers' service at a position which is not less favourable to the Charterers than the position at the time of leaving port or deviating for the salvage services.
All salvage monies earned by the Vessel shall be divided equally between the Owners and the Charterers, after deducting the Master's, Officers' and Crew's share, legal expenses,



p.t.o.

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

value of fuel and lubricants consumed, Hire of the Vessel lost by the Owners during the salvage, repairs to damage sustained, if any, and any other extraordinary loss or expense sustained as a result of the salvage.

The Charterers shall be bound by all measures taken by the Owners in order to secure payment of salvage and to fix its amount.

(c) The Owners shall waive their right to claim any award for salvage performed on property owned or contracted to the Charterers, always provided such property was the object of the operation the Vessel was chartered for, and the Vessel shall remain on hire when rendering salvage services to such property. This waiver is without prejudice to any right the Vessel's Master, Officers and Crew may have under any title.

If the Owners render assistance to such property in distress on the basis of "no claim for salvage", then, notwithstanding any other provisions contained in this Charter Party and even in the event of neglect or default of the Owners, Master, Officers or Crew:

(i) The Charterers shall be responsible for and shall indemnify the Owners against payments made, under any legal rights, to the Master, Officers and Crew in relation to such assistance.

(ii) The Charterers shall be responsible for and shall reimburse the Owners for any loss or damage sustained by the Vessel or her equipment by reason of giving such assistance and shall also pay the Owners' additional expenses thereby incurred.

(iii) The Charterers shall be responsible for any actual or potential spill, seepage and/or omission of any pollutant howsoever caused occurring within the offshore site and any pollution resulting therefrom, wheresoever it may occur and including but not limited to the cost of such measures as are reasonably necessary to prevent or mitigate pollution damage, and the Charterers shall indemnify the Owners against any liability, cost or expenses arising by reason of such actual or potential spill, seepage and/or omission.

(iv) The Vessel shall not be off-hire as a consequence of giving such assistance, or effecting repairs under sub-paragraph (ii) of this sub-clause , and time taken for such repairs shall not count against time granted under Clause 11(e).

(v) The Charterers shall indemnify the Owners against any liability, cost and/or expense whatsoever in respect of any loss of life, injury, damage or other loss to person or property howsoever arising from such assistance.

16. Lien

The Owners shall have a lien upon all cargoes for all claims against the Charterers under this Charter Party and the Charterers shall have a lien on the Vessel for all monies paid in advance and not earned. The Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of the Owners in the Vessel. Except as provided in Clause 12, the Charterers shall indemnify and hold the Owners harmless against any lien of whatsoever nature arising upon the Vessel during the Charter Period while she is under the control of the Charterers, and against any claims against the Owners arising out of the operation of the Vessel by the Charterers or out of any neglect of the Charterers in relation to the Vessel or the operation thereof. Should the Vessel be arrested by reason of claims or

liens arising out of her operation hereunder, unless brought about by the act or neglect of the Owners, the Charterers shall at their own expense take all reasonable step to secure that within a reasonable time the Vessel is released and at their own expense put up bail to secure release of the Vessel.

17. Subject and Assignment

(a) Charterers - The Charterers shall have the option of subletting, assigning or loaning the Vessel to any person or company not competing with the Owners, subject to the Owners' prior approval which shall not be unreasonably withheld, upon giving notice in writing to the Owners, but the original Charterers shall always remain responsible to the Owners for due performance of the Charter Party and contractors of the person or company taking such subletting, assigning or loan shall be deemed contractors of the Charterers for all the purposes of this Charter Party. The Owners make it a condition of such consent that additional Hire shall be paid as agreed between the Charterers and the Owners having regard to the nature and period of any intended service of he Vessel.

(b) If the Vessel is subject, assigned or loaned to undertake rig anchor handling and/or towing operations connected with equipment, other than that used by the Charterers, then a daily increment to the Hire in the amount as stated in Box 29 or pro rata shall be paid for the period between departure for such operations and return to her normal duties for the Charterers.

(c) Owners - The Owners may not assign or transfer any part of this Charter Party without the written approval of the Charterers, which approval shall not be unreasonably withheld. Approval by the Charterers of such subletting or assignment shall not relieve the Owners of their responsibility for due performance of the part of the service which is sublet or assigned

18. Substitute Vessel

The Owners shall be entitled at any time, whether before delivery or at any other time during the Charter Period, to provide a substitute vessel, subject to the Charterers' prior approval which shall not be unreasonably withheld.

19. War

(a) Unless the consent of the Owners be first obtained, the Vessel shall not be ordered nor continue to any port or place or on any voyage nor be used on any service which will bring the Vessel within a zone which is dangerous as a result of any actual or threatened act of war, war, hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture,

p.t.o.



PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or rulers.

(b) Should the Vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (i) the Owners shall be entitled from time to time to insure their interest in the Vessel for such terms as they deem fit up to its open market value and also in the Hire against any of the risks likely to be involved thereby, and the Charterers shall make a refund on demand of any additional premium thereby incurred, and (ii) notwithstanding the terms of Clause 11 Hire shall be payable for all time lost including any loss owning to loss of or injury to the Master, Officers, Crew or passengers or to refusal by any of them to proceed to such zone or to be exposed to such risks.

(c) In the event of additional insurance premiums being incurred or the wages of the Master and/or Officers and/or Crew and/or the cost of provisions and/or stores for deck and/or engine room being increased by reason of or during the existence of any of the matters mentioned in sub-clause (a) the amount of any additional premium and/or increase shall be added to the Hire, and paid by the Charterers on production of the Owners' account therefor, such account being rendered monthly.

(d) The Vessel shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other way whatsoever given by the government of the nation under whose flag the Vessel sails or any other goverament or any person (or body) acting or purporting to act with the authority of such government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or directions.

(e) In the event of the outbreak of war (whether there be a declaration of war or not) between any of the countries stated in Box 30 or in the event of the nation under whose flag the Vessel sails becoming involved in war ( whether there be a declaration of war or not) either the Owners or the Charterers may terminate this Charter Party, whereupon the Charterers shall redeliver the Vessel to the Owners in accordance with PART I if it has cargo on board after discharge thereof at destination or, if debarred under this Clause from reaching or entering it, at a near open and safe port or place as directed by the Owners, or if the Vessel has no cargo on board, at the port or place at which it then is or if at sea at a near, open and safe port or place as directed by the Owners. In all cases Hire shall continue to be paid and, except as aforesaid, all other provisions of this Charter Party shall apply until redelivery.

(f) If in compliance with the provisions of this Clause anything is done or is not done, such shall not be deemed as deviation.

The Charterers shall procure that all Bills of Lading (if any) issued under this Charter Party shall contain the stipulations contained in sub-clauses (a), (d) and (f) of this Clause.

20.  Excluded Ports

(a) The Vessel shall not be ordered to nor bound to enter without the Owners' written permission (a) any place where fever or epidemics are prevalent or to which the Master, Officers and Crew by law are not bound to follow the Vessel;

(b) any ice-bound place or any place where lights, lightships, marks and buoys are or are likely to be

withdrawn by reason of ice on the Vessel's arrival or where there is risk that ordinarily the Vessel will not be able on account of ice to reach the place or to get out after having completed her operations. The Vessel shall not be obliged to force ice nor to follow an icebreaker. If, on account of ice, the Master considers it dangerous to remain at the loading or discharging place for fear of the Vessel being frozen in and/or damaged, he has liberty to sail to a convenient open place and await the Charterers' fresh instructions.

(c) Should the Vessel approach or be brought or ordered within such place, or be exposed in any way to the said risks, the Owners shall be entitled from time to time to insure their interests in the Vessel and/or Hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand. Notwithstanding the terms of Clause 11 Hire shall be paid for all time lost including any lost owning to loss of or sickness or injury to the Master, Officers, Crew or passengers or to the action of the Crew in refusing to proceed to such place or to be exposed to such risks.

21.  General Average and New Jason Clause

General Average shall e adjusted and settled in London unless otherwise stated in Box 31, according to York/Antwerp Rules, 1974, as may be amended. Hire shall not contribute to General Average. Should adjustment be made in accordance with the law and practice of the United States of America, the following provision shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the Owners in General Average to the Payment of any sacrifices, loss or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the Owners before delivery".

22.  Both-to-Blame Collection Clause

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owners in the navigation or the management of the Vessel, the Charterers will indemnify the Owners against all loss or liability to the other or non-carrying ship or her owners insofar as such loss or liability represent loss of or damage



p.t.o.



PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

to, or any claim whatsoever of the owners of any goods carried under this Charter Party paid or payable by the other or non-carrying ship or her owners to the owners of the dais goods and set-off, recouped or recovered by the other or non-carrying or her owners as part of their claim against the Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than or in addition to the colliding ships or objects are at fault in respect of a collision or contact.

23. Structural Alterations and Additional Equipment

The Charterers shall have the option of, at their expense, making structural alterations to the Vessel or installing additional equipment with the written consent of the Owners which shall not be unreasonably withheld but unless otherwise agreed the Vessel is to be redelivered reinstated, at the Charterers' expense, to her original condition. The Vessel is to remain on hire during any period of these alterations or reinstatement. The Charterers, unless otherwise agreed, shall be responsible for repair and maintenance of any such alteration or additional equipment.

24. Health and Safety

The Owners shall comply with and adhere to all applicable international, national and local regulations pertaining to health and safety, and such Charterers' instructions as may be appended hereto.

25. Taxes

Each party shall pay taxes due on its own profit, income and personnel. The Charterers shall pay all other taxes and dues arising out of the operation or use of the Vessel during the Charter Period.

In the event of change in the Area of Operation or change in local regulation and/or interpretation thereof, resulting in an unavoidable and documented change of the Owners' tax liability after the date of entering into the Charter Party or the date of commencement of employment, whichever is the earlier, Hire shall be adjusted accordingly.

26. Early Termination

(a) For Charterers' Convenience - The Charterers may terminate the Charter Party at any time by giving the Owners written notice as stated in Box 15 and by paying the settlement stated in Box 14 and the demobilisation charge stated in Box 16, as well as Hire or other payments due under the Charter Party.
(b) For Cause - If either party becomes informed of the occurrence of any event described in this Clause that party shall so notify the other party promptly in writing and in any case within 3 days after such information is received. If the occurrence has not ceased within 3 days after such notification has been given, this Charter Party may be terminated by either party, without prejudice to any other rights which either party may have, under any of the following circumstances:
(i) Requisition - If the government of the state of registry and/or the flag of the Vessel, or any agency thereof, requisitions for hire or title or otherwise takes possession of the Vessel during the Charter Period.

(ii) Confiscation - If any government, individual or group, whether or not purporting to act as a government or on behalf of any government, confiscates, requisitions, expropriates, seizes or otherwise takes possession of the Vessel during the Charter Period.
(iii) Bankruptcy - In the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver is appointed or if it suspends payment or ceases to carry on business.
(iv) Loss of Vessel - If the Vessel is lost, actually or constructively, or missing, unless the Owners provide a substitute vessel pursuant to Clause 18. In the case of termination, Hire shall cease from the date the Vessel was lost or, in the event of a constructive total loss, from the date of the event giving rise to such loss. If the date of loss cannot be ascertained or the Vessel is missing, payment of Hire shall cease from the date the Vessel was last reported.
(v) Breakdown - If, at any time during the term of this Charter Party, a breakdown of the Owners' equipment or Vessel results in the Owners' being unable to perform their obligations hereunder for a period exceeding that stated in Box 32, unless the Owners provide a substitute vessel pursuant to Clause 18.
(vi) Force Majeure - If a force majeure condition as defined condition as defined in Clause 27 prevails for a period exceeding 15 consecutive days.
(vii) Default - If either party is in repudiatory breach of its obligations hereunder.
Termination as a result of any of the above mentioned causes shall not relieve the Charterers of any obligation for Hire and any other payments due.

27. Force Majeure

Neither the Owners nor the Charterers shall be liable for any loss, damages or delay or failure in performance hereunder resulting from any force majeure event, including but not limited to acts of God, fire, action of the elements, epidemics, war (declared or undeclared), warlike actions, insurrection, revolution or civil strife, piracy, civil war or hostile action, strikes or differences with workmen (except for disputes relating solely to the Owners' or the Charterers' employees), acts of the public enemy, federal or state laws, rules and regulations of any governmental authorities having or asserting jurisdiction in the premises or of any other group, organisation or informal association (whether or not formally recognised as a government), and any other cause beyond the reasonable control of either party which makes continuance of operations impossible.

28. Notices and Invoices

Notices and invoices required to be given under this Charter Party shall be given in writing to the addresses stated in Boxes 21, 35 and 36 as appropriate.



p.t.o.

PART II
"SUPPLYTIME 89" Uniform Time Charter Party for Offshore Service Vessels

29. Wreck Removal

If the Vessel sinks and becomes a wreck and an obstruction to navigation and has to be removed upon request by any compulsory law or authority having jurisdiction over the area where the wreck is placed, Owners shall be liable for any and all expenses in connection with the raising, removal, destruction, lighting or marking of the wreck.

30. Confidentiality

All information or data obtained by the Owners in the performance of this Charter Party is the property of the Charterers, is confidential and shall not be disclosed without the prior written consent of the Charterers. The Owners shall use their best efforts to ensure that the Owners, any of their sub-contractors, and employees and agents thereof shall not disclose any such information or data.

31. Law and Arbitration

*) (a) This Charter Party shall be governed by English law and any dispute arising out of this Charter Party shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within 14 days, failing which the arbitrator already appointed shall act as sole arbitrator. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

*) (b) Should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons in New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The arbitrators shall be members of the Society of Maritime Arbitrators, Inc. of New York and the proceedings shall be conducted in accordance with the rules of the Society.

*) (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place stated in Box 33 subject to the law and procedures applicable there.

*) (d) If Box 33 in PART I is not filled in, sub-clause (a) of this Clause shall apply.

*) (a), (b) and (c) are alternatives; state alternative agreed in Box 33.

32. Entire Agreement

This is the entire agreement of the parties, which supersedes all previous written or oral understandings and which may not be modified except by a written amendment signed by both parties.

33. Severability Clause

If any portion of this Charter Party is held to be invalid or unenforceable for any reason by a court or governmental authority of competent jurisdiction, then such portion will be deemed to be stricken and the remainder of this Charter Party shall continue in full force and effect.

34. Demise



Nothing herein contained shall be construed as creating a demise of the Vessel to the Charterers.

35. Definitions

"Well" is defined for the purposes of this Charter Party as the time required to drill, test, complete and/or abandon a single borehole including any side track thereof.
"Offshore unit" is defined for the purposes of this Charter Party as any vessel, offshore installation, structure and /or mobile unit used in offshore exploration, construction, pipelaying or repair, exploitation or production. "Offshore site" is defined for the purposes of this Charter Party as the area within three nautical miles of an "offshore unit" from or to which the Owners are requested to take their Vessel by the Charterers.
"Employees" is defined for the purposes of this Charter Party as employees, directors, officers, servants, agents or invitees.

36. Headings

The headings of this Charter Party are for identification only and shall not be deemed to be part hereof or be taken into consideration in the interpretation or construction of this Charter Party.

37. Additional Clause

(i) The aforementioned time charter agreement is commercially associated with an existing Memorandum of Agreement dated the 8th October 2001, for the sale of the Pacific Rapier to Dolphin Offshore Enterprises (I) Limited under the terms and Conditions of a Standard NSF 87.

(ii) If the aforementioned sale is concluded prior to the completion of this Time Charter the Charter period the Charter shall not be required to redeliver the vessel to the nominated port as expressed in Part I, Box 8.

(iii) Should the sale of the Pacific Rapier not be concluded to Dolphin Offshore Enterprises (I) Limited for any reason whatsoever this additional clause 37. shall not be applicable and Dolphin Offshore Enterprises (I) Limited shall be obliged to complete their obligation under this Charter Party in full.

p.t.o.

ANNEX "A" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" – dated

## VESSEL SPECIFICATION

1. **General**

   (a) Owner:  Name: _____

   _____
   Address: _____
   _____

   _____
   (b) Operator:  Name: _____

   Address: _____

   (c) Vessel's Name: _____ Builder: _____

   (d) Year Built: _____

   (e) Type: _____

   (f) Classification and Society: _____

   (g) Flag : _____

   (h) Date of next scheduled drydocking: _____

1. **Performance**

   (a) Certified Bollard Pull (Tonnes) _____
   Equipment
   (b) Speed/Consumption (Non-Towing)
   (Approx. Daily Fuel Consumption)
   (Fair Weather)

   Max Speed: _____ Kts (app.) _____ Tonnes

   Service Speed: _____ Kts (app.) _____ Tonnes
   Standby (main engines secured) _____ Tonnes
   (c) Approx. Towing/Working Fuel Consumption
   Engine Power         100% _____ Tonnes
   (d) Type(s) and Grade(s) of Fuel used: _____

2. **Dimensions and Capacities/Discharge Rates:**

   (a) L.O.A. (m): ___ Breadth (m): ___ Depth (m): _____
   Max Draught (m): _____

   (b) Deadweight (metric tons): _____

   Discharge Rate

4. **Machinery**

   (a) BHP Main Engines: _____

   (b) Engine Builder: _____

   (c) Number of Engines and Type: _____

   (d) Generators: _____

   (e) Stabilizers: _____

   (f) Bow Thruster(s): _____

   (g) Stern Thruster(s): _____

   (h) Propellers/Rudders: _____

   (i) Number and Pressure Rating of Bulk
   Compressors: _____
   (j) Fuel Oil Metering System: _____

5. **Towing and Anchor Handling**

   (a)(i) Stern Roller (Dimensions): _____
   (ii) Anchor Handling/Towing Winch:

   (iii) Rig Chain Locker Capacity (Linear feet of
   3 in. Chain): _____
   (iv) Tugger Winches: _____
   (v) Chain Stopper Make and Type: _____
   (b)(i) Towing Wire: _____
   (ii) Spare Towing Wire: _____
   (iii) Work Wire:

   (iv) Spare Work Wire:

   (v) Other Anchor Handling Equipment
   (e.g. Pelican Hooks, Shackles,
   Stretchers etc.):

p.t.o.



ANNEX "A" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" – dated

(c)  *Cargo Fuel max (m³): _____   ___/hr at _____head
(d)  *Drill Water max (m³): _____   ___/hr at _____head
(e)  Potable Water (m³): _____   ___/hr at _____head
(f)  Dry Bulk (m³/cu.ft): ___ in Tanks ___/hr at _____head
(g)  Liquid Mud (m³/barrels): _____  ___/hr at _____head
      (max. SG) _____
      State type of recirculation system i.e.
      Mechanical agitation, centrifugal pumps etc. _____

(h)  Cargo Deck Area (m²): _____  Capacity (m.t.): ____
      Length (m) x Breadth (m): _____
      Load Bearing Capacity _____
(i)  Heavy Weight Brine (m³/barrels):_____
      (max. SG) _____   ___/hr at _____head

      *  Multipurpose Tanks yes/no: _____

### 6. Radio and Navigation Equipment

      (a)  Radios
            Single Side Band: _____
            VHF: _____
            Satcom: _____
(b)  Electronic Navigation Equipment: ____

(c)  Gyro: _____
(d)  Radar: _____
(e)  Autopilot: _____
(f)  Depth Sounder: _____

p.t.o.



ANNEX "A"

VESSEL SPECIFICATION

7.  **Fire Fighting Equipment**

    (a)  Class (FF1, FF2, FF3, other): _____

    (b)  Fixed: _____

    (c)  Portable: _____

    _____

    _____

    _____

8.  **Accommodation**

    (a)  Crew: _____      (b)  Passengers: _____

Yes/No

    _____

9.  **Gallery**

    (a)  Freezer Space (m³): _____
    (b)  Cooler (m³): _____

10. **Additional Equipment**

    (a)  Mooring Equipment:

    (b)  Joystick:

  (c)  Other:

11. **Standby/Survivor Certificate**

Nos:

# M.V. PACIFIC RAPIER
## 2,800 BHP Commissionary/Supply/ Utility Vessel

Revision:          001/Jul/2001

**BUILT**
Imamura Zosen, Japan, 1982
**CALL SIGN**
HP9254
**CLASSIFICATION**
ABS + A1 Supply Vessel + AMS (E)

**FLAG**
Panama
**IMO No.**
8120118

Foam/Dispersant:    2 tanks each, 7.8 cubic meters, integral

**ACCOMMODATION**

Officers and Crew:    6 x 1 berths
                      2 x 2 berths
                      2 x 3 berths
                      4 x 4 berths

Total          32 berths

## DIMENSIONS

| | |
|---|---|
| Length, overall: | 57.70 m |
| Breadth, moulded: | 12.20 m |
| Depth, moulded: | 4.50 m |
| Summer Draft: | 3.99 m |
| GRT: | 855 tonnes |
| NRT: | 341 tonnes |

## MISCELLANEOUS

1.    Wood sheathed main deck
2.    Cargo control centre in wheelhouse with Nitto Seiko electronic liquid cargo flowmeters incorporating printout meters.
3.    Meters for ship's fuel consumption.
4.    Fresh water generator, 5 tonnes/day.
5.    Rigid 5.2 m FRC, 60HP outboard.
6.    Statutory life buoys, life jackets, pyrotechnics.
7.    Welding machine.
8.    Search light and deck flood lights.
9.    Sewage treatment plant.
10.   P.A. System.
11.   TV and video.

## MACHINERY

| | |
|---|---|
| Main engines: | 2 x Yanmar T260ST, total 2800 BHP at 700 rpm, driving fixed pitch propellers in Kort nozzles |
| Rudders: | Trailing flap rudders for increased manoeuvrability |
| Bow Thruster: | Kamome controllable pitch driven by Yanmar 6HAS-DT, 350 BHP developing 4 tonnes thrust |
| Generator: | 3 x 160 kW, 440V, 60Hz alternators driven by Yanmar 6HAL-HT diesel engines |

## PERFORMANCE

Speed:    @ 100% MCR: 13.0 kts
          @ 85% MCR: 12.0 kts

## TOWING AND ANCHOR HANDLING

Bollard Pull:    N/A

## DECK MACHINERY

| | |
|---|---|
| Tugger Winch: | 1 x 5 tonnes hydraulic |
| Anchor/Chain: | 2 x 1.45 tonnes anchors and 2 x 412 m x 32 mm dia. chain. Buoy mooring wire drum with capacity for 300 m x 25 mm wire driven from windlass |
| Windlass: | 1 x Electro-hydraulic windlass, 6 tonnes x 9 m/min |
| Stern Roller: | 3.64 m x 1.52 m (dia.), 180 tonnes SWL |

## DISCHARGE PUMPS

| | |
|---|---|
| Potable Water: | 1 x 100 cubic meters/hr at 50 m head<br>1 x 80 cubic meters/hr at 50 m head |
| Drill Water: | 2 x 45 cubic meters/hr at 50 m head |
| Fuel: | 1 x 100 cubic meters/hr at 50 m head, plus<br>1 x 118 cubic meters/hr at 30 m head |
| Standby: | 1 x 50 cubic meters/hr at 50 m head |

## CAPACITIES

| | |
|---|---|
| Clear Deck Space: | 36.7 m x 9.7 m = 360 square meters |
| Deck Cargo: | 500 tonnes |
| Deck Loading: | 4.5 tonnes/square meter |
| Fuel: | 520 cubic meters |
| Potable Water: | 627.4 cubic meters |
| Drill Water: | 318.9 cubic meters |
| Deadweight: | 1260 tonnes |
| Ship's Stores: | Freezer 13.2 cubic meters (465 cu. ft.)<br>Cooler 13.2 cubic meters (465 cu. ft.) |

## ELECTRONICS

| | |
|---|---|
| Radar: | JRC JMA 3210 |
| Auxiliary Radar: | JRC JMA 2144 |
| Auto Pilot: | Tokyo Keiki with Sperry ES11 gyro compass |
| Echo Sounder: | JMC - F830 digital |
| Satellite Navigation: | GPS Shipmate RSS700 |
| Communications: | G.M.D.S.S. (Global Maritime Distress & Safety System)<br>2 x SSB<br>2 x VHF<br>2 x Inmarsat C 435678610 / 435678620<br>3 x VHF (portable)<br>2 x SART<br>1 x EPIRB<br>1 x Navtex |

## EXTERNAL FIRE FIGHTING

| | |
|---|---|
| Capacity: | 260 cubic meters/hour x 120 m pump |
| Monitors: | 2, each 130 cubic meters/hour, on wheelhouse top |

Contact Swire Pacific Offshore to confirm the accuracy of this information prior to basing any commercial decisions on the information.  www.swire.com.sg          © Copyright Swire Pacific Offshore 2001



ANNEX "B" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" – dated

## INSURANCE

Insurance policies (as applicable) to be procured and
maintained by the Owners under Clause 14:

(1) <u>Marine Hull Insurance</u> - Hull and Machinery Insurance
shall be provided with limits equal to those normally
carried by the Owners for the Vessel.

(2) <u>Protection and Indemnity Insurance</u> - Protection and
Indemnity or Marine Liability insurance shall be
provided for the Vessel with a limit equal to the value
under paragraph 1 above or U.S. $5 million, whichever is
greater, and shall include but not be limited to coverage
for crew liability, third party bodily injury and property
damage liability, including collision liability, towers
liability (unless carried elsewhere).

(3) <u>General Third Party Liability Insurance.</u> - Coverage
shall be for:
Bodily Injury ....................... per person.
Property Damage .................... per occurrence.

(4) <u>Workmen's Compensation and Employer's Liability
Insurance for Employees.</u> - Covering non-employees
for statutory benefits as set out and required by local law
in area of operation or area in which the Owners may
become legally obliged to pay benefits.

(5) <u>Comprehensive General Automobile Liability Insurance.</u>
- Covering all owned, hired and non-owned vehicles,
coverage shall be for:
Bodily Injury     According to the local law.
Property Damage   In an amount equivalent to
_____ - single limit per occurrence.



ANNEX "C" to Uniform Time Charter Party for Offshore Service Vessels
Code Name: "SUPPLYTIME 89" – dated

## AGREEMENT FOR MUTUAL INDEMNITY AND WAIVER OF RECOURSE

(Optional, only applicable if stated in Box 28 in PART I)

This Agreement is made between the Owners and the Charterers and is premised on the following:

(a) The Charterers and the Owners have entered into a contract or agreement dated as above regarding the performance of work or service in connection with the Charterers' operations offshore ("Operations");

(b) The Charterers and the Owners have entered into, or shall enter into, contracts or agreements with other contractors for the performance of work or service in connection with the Operations;

(c) Certain of such other contractors have signed, or may sign, counterparts of this Agreement or substantially similar agreements relating to the Operations ("Signatory" or collectively "Signatories"); and

(d) The Signatories wish to modify their relationship at common law and avoid entirely disputes as to their liability for damage or injuries to their respective property or employees;

In consideration of the premises and of execution of reciprocal covenants by the other Signatories, the Owners agree that:

1. The Owners shall hold harmless, defend, indemnify and waive all rights of recourse against the other Signatories and their respective subsidiary and affiliate companies, employees, directors, officers, servants, agents, invitees, vessel(s), and insurers, from and against any and all claims, demands, liabilities or causes of action of every kind and character, in favour of any person or party, for injury to, illness or death of any employee of or for damage to or loss of property owned by the Owners (or in possession of the Owners by virtue of an arrangement made with an entity which is not a Signatory) which injury, illness, death, damage or loss arises out of the Operations, and regardless of the cause of such injury, illness, death, damage or loss even though caused in whole or in part by a pre-existing defect, the negligence, strict liability or other legal fault of other Signatories.

2. The Owners (including the Vessel) shall have no liability whatsoever for injury, illness or death of any employee of another signatory under the Owners' direction by virtue of an arrangement made with such other Signatory, or for damage to or loss of property of another Signatory in the Owners' possession by virtue of an arrangement made with such other Signatory. In no event shall the Owners (including the Vessel) be liable to another Signatory for any consequential damages whatsoever arising out of or in connection with the performance or non-performance of this Agreement, including, but not limited to, loss of use, loss of profits, shut-in or loss of production and cost of insurance.

3. The Owners undertake to obtain from their insurers a waiver of rights of subrogation against all other Signatories in accordance with the provisions of this Agreement governing the mutual liability of the Signatories with regard to the Operations.

4. The Owners shall attempt to have those of their sub-contractors which are involved in the Operations become Signatories and shall promptly furnish the Charterers with an original counterpart of this Agreement or of a substantially similar agreement executed by its sub-contractors.

5. Nothing contained in this Agreement shall be construed or held to deprive the Owners or the Charterers or any other Signatory as against any person or party, including as against each other, of any right to claim limitation of liability provided by any applicable law, statute or convention, save that nothing in this Agreement shall crate any right to limit liability. Where the Owners or the Charterers or any other Signatory may seek an indemnity under the provisions of this Agreement as against each other in respect of a claim brought by a third party, the Owners or the Charterers or any other Signatory shall seek to limit their liability against such third party.

6. The Charterers shall provide the Owners with a copy of every counterpart of this Agreement or substantially similar agreement which is executed by another Signatory pertaining to the Operations, and shall, in signing this, and in every counterpart of this Agreement, be deemed to be acting as agent or trustee for the benefit of all Signatories.

7. This Agreement shall inure to the benefit of and become binding on the Owners as to any other Signatories on the later of the date of execution by the Owners and the date of execution of a counterpart of this Agreement or a substantially similar agreement by such other Signatory pertaining to the Operations.

8. Any contractor, consultant, sub0contractor, etc., performing work or service for the Charterers or another Signatory in connection with the Operations which has not entered into a formal contract for the performance of such work or service may nevertheless become a Signatory by signing a counterpart of this Agreement or a substantially similar agreement which shall govern, as to the subject of this Agreement, the relationship between such new Signatory and the other Signatories and also by extension its relations with the Charterers.

9. This Agreement may be executed in any number of counterparts or substantially similar agreements as necessary but all such counterparts shall together constitute one legal instrument.

EXHIBIT "B"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE KAPLAN

------------------------------------------------------------------X

SWIRE PACIFIC OFFSHORE (DUBAI) LLC,

               Plaintiff,

  - against -

DOLPHIN OFFSHORE ENTERPRISES
(INDIA) LIMITED.,

               Defendant.

07 Civ. _____  9449

ECF CASE

------------------------------------------------------------------X

### AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  )
                 )   ss: SOUTHPORT
County of Fairfield   )

Nancy R. Peterson, being duly sworn, deposes and says:

1.    I am a member of the Bar of this Court and represent the Plaintiff herein. I am familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

### DEFENDANT IS NOT PRESENT IN THE DISTRICT

2.    I have attempted to locate the Defendant, DOLPHIN OFFSHORE ENTERPRISES (INDIA) LIMITED, within this District. As part of my investigation to locate the Defendant within this District, I checked the telephone company information directory, as well as the white and yellow pages for New York listed on the Internet or World Wide Web, and did not find any listing for the Defendant. Finally, I checked the New York State Department of Corporations' online database which showed no listing or registration for the Defendant.

3.    I submit based on the foregoing that the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.    Upon information and belief, the Defendant has, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendant.

**PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER**

5.    Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, be and is hereby appointed, in addition to the United States Marshal, to serve the Process of Maritime Attachment and Garnishment and/or the Verified Complaint, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendant.

6.    Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

7.    To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple

-2-

delivery of the Process of Maritime Attachment and Garnishment to the various garnishes to be identified in the writ.

### PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

8.    Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendant, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

### PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

9.    Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, to authorize service of process via facsimile or e-mail following initial *in personam* service.

–3–

Dated: October 23, 2007
      Southport, CT

Nancy R. Peterson

Sworn and subscribed to before me
This 23rd day of October, 2007.

Notary Public

-4-

EXHIBIT C

# FACSIMILE TRANSMISSION

**M  F  B**

S O L I C I T O R S

**Confidentiality Notice**
The information contained in this fax is confidential and may be privileged. It is only for the use of the intended recipient. If you are not the named or intended recipient, please notify us immediately. In such an event, you must not make any use of this fax or the information contained in it and you may not disclose the contents to any other person. Please contact us immediately if any part of this fax is inadequately received.

4 5    M O O R F I E L D S

L O N D O N    E C 2 Y    9 A E

**DIRECT TEL:** 020 7330 8007

**TELEPHONE: 020 7330 8000**

**FACSIMILE:  020 7256 6778**

**EMAIL:  mail@m-f-b.co.uk**

**EMAIL:** bwebb@m-f-b.co.uk

**WEBSITE: www.m-f-b.co.uk**

TOTAL NUMBER OF PAGES        1

| | |
|---|---|
| DATE: | 23 October 2007 |
| TO: | **ROBERT GAISFORD** |
| FAX NO: | 01580 201124 |
| OUR REF: | BW/SPO/0030/267912 |
| MATTER: | **"PACIFIC RAPIER" – C/P dd 09.10.01** |

We act on behalf of the Owners of the above vessel, "PACIFIC RAPIER", Swire Pacific Offshore (Dubai) LLC.

The "PACIFIC RAPIER" was time chartered to Dolphin Offshore Enterprises (India) Limited on a Supplytime 89 form dated 09.10.01.

Disputes have arisen between the parties concerning unpaid hire.

We have been instructed to appoint you as arbitrator on behalf of Owners in respect of all disputes arising under the charterparty. We would therefore be grateful if you could confirm whether you are able to accept this appointment.

Best regards,

Brian Webb

**MFB**

# ROBERT GAISFORD

BRAMDEAN, STONEGATE, WADHURST, EAST SUSSEX, TN5 7EP
Phone: 01580 200910   Fax: 01580 201124

## FACSIMILE

23 October 2007

To:    MFB
Attn:  Mr Brian Webb
Fax:   020 7256 6778

Pages (including this page): 1

### CONFIDENTIALITY NOTICE
THIS FACSIMILE IS CONFIDENTIAL AND IS SOLELY FOR THE NAMED ADDRESSEE. IF YOU ARE
NOT THE ADDRESSEE, PLEASE TELEPHONE ME IMMEDIATELY AND DO NOT READ THE
CONTENTS, COPY IT OR DISCLOSE IT TO ANYONE.

Dear Sirs,

"PACIFIC RAPIER" – c/p 9.10.2001

Thank you for your fax today. I am pleased to accept appointment as arbitrator as requested, my
acceptance being on the LMAA Terms (2006).

I look forward to receiving a copy of the charterparty and in the meantime take the opportunity
of thanking you for this appointment.

Yours faithfully,

EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
SWIRE PACIFIC OFFSHORE (DUBAI) LLC,     :

   :

   :

          Plaintiff,     :    07 Civ. 9449 (LAK)

   :

  - against -     :    ECF CASE

   :

DOLPHIN OFFSHORE ENTERPRISES     :    **EX-PARTE ORDER**
(INDIA) LIMITED,     :    **FOR PROCESS**

   :    **OF MARITIME**

          Defendant.     :    **ATTACHMENT**
-----------------------------------------------------------------------X

      WHEREAS, on October 23, 2007 Plaintiff, SWIRE PACIFIC OFFSHORE (DUBAI) LLC,

filed a Verified Complaint herein for damages amounting to **$1,089.227.14** inclusive of interest, costs

and reasonable attorney's fee, and praying for the issuance of Process of Maritime Attachment and

Garnishment pursuant to Rule B of the Supplemental Admiralty Rules for Certain Admiralty and

Maritime Claims of the Federal Rules and Civil Procedure; and

      **WHEREAS**, the Process of Maritime Attachment and Garnishment would command that the

United States Marshal or other designated process server attach any and all of the Defendant's

property within the District of this Court; and

      **WHEREAS**, the Court has reviewed the Verified Complaint and the Supporting Affidavit,

and the conditions of Supplemental Admiralty Rule B appearing to exist, it is hereby

      **NOW,** upon motion of the Plaintiff, it is hereby:

      **ORDERED**, that pursuant to Rule B of the Supplemental Rules for Certain Admiralty and

Maritime Claims, the Clerk of Court shall issue Process of Maritime Attachment and Garnishment

against all tangible or intangible property, credits, letters of credit, bills of lading, effects, debts and

monies, electronic funds transfers, freights, sub-freights, charter hire, sub charter hire or any other

funds or property up to the amount of **$1,089.227.14** belonging to, due or being transferred to, from or for the benefit of the Defendant, including but not limited to such property as may be held, received or transferred in Defendant's name(s), or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishes to be named, or later identified, on whom a copy of the Process of Maritime Attachment and Garnishment may be served; and it is

**ORDERED** that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court; and it is further

**ORDERED** that following initial service by the U.S. Marshal or other designated process server upon each garnishee, that supplemental service of the Process of Maritime Attachment and Garnishment, as well as this Order, may be made by way of facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee; and it is further

**ORDERED** that service on any garnishee as described above is deemed to be effective and continuous service throughout the remainder of the day upon which service is made commencing from the time of such service, and such service is further deemed to be effective through the end of the next business day, provided that another service is made the next business day; and it is further

**ORDERED** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee may consent, in writing, to accept service by any other means.

Dated: November ___, 2007

<div align="center">

**SO ORDERED:**

_____
U.S.D.J.

</div>

EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

SWIRE PACIFIC OFFSHORE (DUBAI) LLC, :

                     :

                Plaintiff,        :        07 Civ. 9449 (LAK)

                     :

      - against -           :        ECF CASE

                     :

DOLPHIN OFFSHORE ENTERPRISES :
(INDIA) LIMITED, :

                     :

              Defendant.      :

------------------------------------------------------------------------X

### ORDER APPOINTING SPECIAL PROCESS
### SERVER PURSUANT TO F.R.C.P. RULE 4(c)

       An application having been made by counsel for Plaintiff for an Order Appointing a

Special Process Server pursuant to Rule 4(c) of the Federal Rules of Civil Procedure,

       NOW, on reading and filing the Affidavit of Nancy R. Peterson, sworn to on October 23,

2007, and good cause shown having been shown, it is hereby

       ORDERED that Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson

or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any

process server employed by Gotham Process Servers, be and is hereby appointed, in addition to

the United States Marshal, to serve the Process of Attachment and Garnishment and/or the

Verified Complaint, together with any interrogatories, upon the garnishee(s), together with any

other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff)

may hold assets of, for or on account of, Defendant.

Dated: New York, NY
       November _____, 2007

                             _____

                                   U.S.D.J.